

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>    v.<br><br>COURTLAND M. GETTEL,<br><br>         Defendant. | Case No. 16 CR1099-WQH<br><br>**INFORMATION**<br><br>18 U.S.C. § 1349<br>(Wire Fraud Conspiracy)<br><br>18 U.S.C. § 981(a)(1)(C),<br>28 U.S.C. § 2461(c)<br>(Criminal Forfeiture) |

The United States Attorney charges, at all times material:

Background

1. Defendant COURTLAND M. GETTEL was the operator and majority shareholder of Conix Inc. ("Conix"), a real estate investment company based in Tucson, Arizona. Conix purchased single-family homes from banks or distressed homeowners, refurbished the properties, and then re-sold them for a profit. Conix also purchased performing and non-performing real estate debt from mortgage lenders, and hired a third party to service the loans.

2. J.G., an attorney licensed to practice in Arizona, began working with GETTEL in approximately May 2008. In around December

2010, J.G. left his law practice to devote most of his time to work with GETTEL at Conix.

3. C.D. was a mortgage originator and lender experienced in issuing high value short-term loans. C.D. began working with GETTEL at Conix in around early 2012. In around October 2012, C.D. became GETTEL's informal partner.

4. Through Conix, GETTEL and C.D. also purchased commercial real estate. In around 2013, they created Variant Commercial Real Estate, LLC ("Variant") to conduct the commercial real estate portion of their business portfolio.

5. In connection with their business ventures, GETTEL, C.D., J.G., and their associates created hundreds of additional corporations and limited liability companies ("LLCs"). GETTEL and his partners created and used these corporations and LLCs in part to shield assets and disguise the true participants in various transactions.

6. In around mid-2012, GETTEL and C.D. relocated to San Diego, California, where they opened an office. In around July 2012, they hired R.R., a notary licensed in the State of California, to act as an office manager.

7. In approximately early 2014, GETTEL and C.D. made plans to invest money in high-end rental properties in La Jolla and Del Mar, by buying and refurbishing luxury homes and then renting the properties to vacationers. GETTEL and C.D. pitched this business plan to private investors in an effort to generate financing.

The Conspiracy

8. Paragraphs 1 through 7 are realleged and incorporated by reference herein.

9. Beginning at least around August 2013, and continuing through January 2015, within the Southern District of California and elsewhere, defendant COURTLAND M. GETTEL knowingly and intentionally conspired and agreed with C.D., J.G., R.R., and others to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

10. The purpose of the conspiracy was to fraudulently obtain tens of millions of dollars from private real estate lenders by pretending that properties used as collateral were debt-free, when in fact the properties were already encumbered with millions of dollars in higher-priority claims, so that the conspirators could use the tens of millions of dollars in loan proceeds for their own personal use and benefit.

<u>Manner and Means of the Conspiracy</u>

11. To further the conspiracy, GETTEL, C.D., J.G., R.R., and others utilized the following manner and means, among others:

    a. GETTEL and C.D. would acquire luxury homes in La Jolla and Del Mar, California, and would use the properties as collateral to obtain tens of millions of dollars in loans.

    b. In order to secure the loans, GETTEL and C.D. would misrepresent the value of the properties, conceal the true purchase prices, falsify their intended use of the properties, and make other material misrepresentations to the lenders.

    c. GETTEL and C.D. would then negotiate with new lenders to obtain millions of dollars in additional loans secured by the properties, concealing from the new lenders that the properties were already encumbered with higher-priority claims.

    d. In order to conceal the existing debt from the new lenders, J.G. would create materially false and fraudulent "Deeds

of Full Release" and other fraudulent documents purporting to show that the first loans had been paid in full, when in fact the loans remained outstanding.

  e. J.G. and R.R. would forge signatures and use fraudulent notary stamps on the fraudulent deeds, to make the fabricated documents appear authentic.

  f. In order to make the false and fraudulent release of the existing loans appear legitimate, J.G. would record the fraudulent "Deeds of Full Release" and other fraudulent documents at the San Diego County Recorder's Office.

  g. In order to insulate themselves from liability for the fraudulently-obtained loans, GETTEL, P.C.D., R.R., and others would authorize others to forge their own signatures on loan documents and deeds of trust and on the fraudulent releases.

  h. GETTEL, C.D., and J.G. would collect tens of millions of dollars in fraudulently-obtained loan proceeds issued by lenders they knew were relying on fabricated documents and fraudulent misrepresentations about the properties.

  i. In order to conceal GETTEL's and C.D.'s participation in the fraud, GETTEL, C.D., and J.G. would direct the proceeds to bank accounts owned by corporations and LLCs, and to attorney bank accounts owned by J.G., before disbursing the proceeds to themselves or to others at their direction.

  j. To obtain millions of dollars in further proceeds, GETTEL and C.D. would repeat this process over again, pretending to third lenders that the second loans had also been paid in full, when in fact both the first and second loans remained outstanding.

12. Using this fraudulent scheme, GETTEL, C.D., and J.G. obtained the following second and third loans, totaling approximately $33.6 million in fraudulently-obtained proceeds, by concealing the existing debt and falsely pretending that each lender would have a first-position secured interest in the following properties:

| Property | Approx. Date | Lender | Approx. loan amount |
|---|---|---|---|
| Mar Scenic | 8/29/2013 | R2R | $3,000,000 |
| Calle Del Oro | 10/31/2013 | Anchor | $3,600,000 |
| Avenida Cresta | 4/1/2014 | Ragen | $3,000,000 |
| Calumet | 4/14/2014 | Anchor | $4,625,000 |
| Avenida Cresta | 5/7/2014 | LJ 6309 | $4,000,000 |
| Calumet | 6/3/2014 | CPIF | $9,818,000 |
| Calle Del Oro | 7/15/2014 | CPIF | $3,089,000 |
| Mar Scenic | 10/9/2014 | Partner's Capital | $2,646,000 |
| | | Total: | $33.6 million |

All in violation of Title 18, United States Code, Section 1349.

FORFEITURE ALLEGATION

13. Upon conviction of the felony offense alleged in this Indictment and pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Rule 32.2, Federal Rules of Criminal Procedure, defendant COURTLAND M. GETTEL shall forfeit to the United States any property, real or personal, which constitutes or was derived from proceeds traceable to such violation, including, but not limited to a forfeiture money judgment in an amount not less than $33,600,000.

5

14. If any of the above-described forfeited property, as a result of any act or omission of GETTEL, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be subdivided without difficulty, it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), made applicable herein by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the property described above subject to forfeiture.

LAURA E. DUFFY
United States Attorney

DATED: 5/19/2016

EMILY W. ALLEN
Assistant U.S. Attorney