ROBERT S. BREWER, JR.
United States Attorney
EMILY W. ALLEN (Cal. Bar No. 234961)
Assistant U.S. Attorney
880 Front Street, Room 6293
San Diego, California 92101-8893
Tel: (619) 546-9738
Email: emily.allen@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 16CR1099-WQH |
|---|---|
| v. | GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S EMERGENCY MOTION FOR ORDER REDUCING OR MODIFYING JUDGMENT UNDER 18 U.S.C. § 3582(c)(1)(A)(i) |
| COURTLAND GETTEL, | |
| Defendant. | |

Defendant Courtland Gettel has not and cannot establish that his 135-month sentence should be reduced after he has served just 39 months, because: (1) there are no "extraordinary and compelling" reasons to reduce his sentence; (2) he remains a danger to the community, and (3) he has not established eligibility under the U.S. Sentencing Commission's policy statements—each of which is required by the statute, 18 U.S.C. § 3582(c)(1)(A). Accordingly, the United States opposes his Emergency Motion for Order Reducing Sentence or Modifying Judgment (Doc. 193).

# I

# **BACKGROUND**

Over the course of nearly two years, using the legitimacy he gained through a successful real estate business and longstanding relationships with unwitting investors, Gettel stole nearly $50 million using fraudulent real estate loans purportedly backed by

multimillion-dollar luxury San Diego homes. In fact, the collateral Gettel pledged to secure his loans was worthless, because it was already encumbered many times over with pre-existing debt. Using a series of fake documents and forged signatures (including forgeries of his then-wife, Kathryn Nighswander), Gettel made it appear that the earlier loans—the proceeds of which he had pocketed—had all been repaid. The money was funneled to bank accounts Gettel controlled.

All the while, Gettel was engaged in an entirely separate multimillion-dollar fraud scheme in Tucson, Arizona. There, in October 2013, Gettel obtained a $73.5 million investment to acquire and refurbish over 30 commercial properties throughout the United States. Once they had secured the investment, Gettel orchestrated a fraudulent scheme to siphon and divert the investor's funds for his own personal use, using shell entities and fraudulent invoices to claim reimbursement for renovations that were never performed. As a result, some of the properties fell into disrepair and lost their certificates of occupancy. Others suffered from raw sewage flowing through the units, citations for Housing Code violations, and structural defects. In total, Gettel and his co-conspirators siphoned $13 million out of these investments.

When Gettel's money ran out and the victims began to discover the massive real estate fraud, Gettel was unrepentant. He continued lying, created more fraudulent records to cover up the original fraud, and attempted to blame the entire scheme on his unsuspecting codefendant Jeffrey Greenberg. After Gettel learned that federal authorities were investigating his criminal conduct, after his Coronado home was searched by the FBI, after he consulted with experienced criminal defense counsel, and after Gettel reviewed evidence (including documents as well as audio recordings of himself) proffered by the United States Attorney's Offices in two different districts, Gettel chose to plead guilty and secure the benefit of a reduced sentencing recommendation from the United States. Indeed, his attorney successfully negotiated an unusually favorable plea agreement that promised a minimum recommended reduction of four levels under the U.S. Sentencing Guidelines for Gettel's cooperation.

Nevertheless, even after he was charged with and pled guilty to the offense, Gettel secretly continued his fraudulent scheme. He concocted a nearly identical fraud, attempting to obtain tens of millions of dollars in additional fraudulent real estate loans, all while simultaneously pretending to assist law enforcement in the ongoing investigation of this case. Even after this new fraud was uncovered, he continued to obfuscate, and lied to investigators when they questioned him about the new allegations. After his ongoing conduct was corroborated with significant new evidence, Gettel was arrested for his violation of the conditions of pretrial release. His attorney then successfully negotiated a revised sentencing agreement, avoiding the consequences of a finding that he was in breach of the plea agreement and preserving Gettel's favorable four-level reduction for pre-plea cooperation. This Court sentenced Gettel in accordance with his plea and supplemental sentencing agreement.

## II

## STATEMENT OF FACTS

### A. Procedural History

On May 19, 2016, an Information was filed charging Gettel with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. Doc. 1. The same day, he pleaded guilty by way of plea agreement to the Information. *See* Plea Agreement, Doc. 10. As part of his plea agreement, Gettel agreed to recommend that the Court calculate the U.S. Sentencing Guidelines beginning at Base Offense Level 7, adding 22 levels for a loss more than $25 million, and to include a 4-level increase for his aggravated role as a leader or organizer of the conspiracy. The parties also agreed to recommend a 3-level decrease for acceptance of responsibility and a 4-level decrease under USSG §5K1.1 for Gettel's pre-plea cooperation. *Id*. at 8. As part of this agreement, Gettel waived his right to appeal and collateral attack of the conviction and sentence, with the exception of a limited right to collateral attack based on a claim of ineffective assistance of counsel. *Id*. at 13-14.

3

Shortly after he entered his guilty plea in this case, Gettel pled guilty to the separate fraud in the District of Arizona. *See* D. Az. Case No. 16CR1064-CKJ-BGM. In that case, Gettel was represented by independent retained counsel located in Arizona. As part of his plea agreement in that case, Gettel agreed to recommend a sentence concurrent with and not exceeding the sentence imposed in this case.

On March 23, 2017, the United States moved for an arrest warrant based on Gettel's new crimes in violation of the conditions of his pretrial release (including wire fraud, in violation of 18 U.S.C. § 1341, and false statements to federal agents, in violation of 18 U.S.C. § 1001). *See* Motion for Arrest Warrant, Doc. 80. An arrest warrant was issued and Gettel was taken into custody shortly thereafter. On July 13, 2017, Gettel entered a supplement to his plea agreement and agreed to recommend a revised set of sentencing guidelines. *See* Doc. 115. In doing so, Gettel admitted, under penalty of perjury, that he had breached the plea agreement by failing to fully accept responsibility, violating Court orders, engaging in additional fraudulent conduct after entering his guilty plea, and making false statements to federal law enforcement agents. *Id*. at 2. He acknowledged that as a result, the United States was free to recommend any lawful sentence. In the Supplement, the parties agreed to a revised set of guidelines, including an additional 2-level increase for obstruction of justice and no decrease for acceptance of responsibility. The parties agreed, however, to continue to recommend a 4-level decrease for pre-plea cooperation. *Id*. at 8-9. Gettel once again waived his right to appeal the conviction and any sentence above the high end of the guideline range recommended by the United States—that is, 135 months in custody. *Id*. at 11.

On October 17, 2017, this Court sentenced Gettel to 135 months in custody. *See* Amended Judgment, Doc. 167. On December 4, 2017, the District Court in the District of Arizona sentenced Gettel to 46 months in custody, to be served concurrent with his sentence in this case, consistent with his Arizona plea agreement. *See* D. Az. Case No. 16CR1064-CKJ-BGM, Doc. 36. In each case, he was also ordered to pay significant restitution to the victims of his offenses.

On October 30, 2017, despite his waiver, Gettel filed a notice of appeal, which he later withdrew. He also filed a motion requesting habeas relief pursuant to 28 U.S.C. § 2255. Doc. 156. This Court denied that motion on May 3, 2018. Doc. 181.

Gettel has been in custody since his pretrial release was revoked in March 2017. According to BOP records, he has served approximately 39 of his 135-month sentence in this case (and 39 of his 46-month sentence in the District of Arizona). *See* Sentence Monitoring Computation Data (Exh. 1), p.3. Gettel's projected release date is November 23, 2026. *Id.* He has served 28.8% of his full term of imprisonment (or 33.6% of his term based on his projected release date with good time credit). *Id.* Gettel also has a significant outstanding balance on his restitution obligation, with $43.8 million owing. *See* Inmate Financial Responsibility (Exh. 2).

**B.  Bureau of Prisons' Response to COVID-19 Pandemic**

COVID-19 presents extraordinary risks to the public and in particular to those confined to live in close proximity to others. In response to this unfortunate reality, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020).[1] Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012).[2] That protocol established a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id.* The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

---

[1] https://www.bop.gov/resources/news/20200319_covid19_update.jsp

[2] https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf

5

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January 2020. The agency began developing policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization. On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, BOP has repeatedly revised the Action Plan to address the developing crisis.

The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Likewise, all official staff travel has been cancelled, as has most staff training. All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, such as Philadelphia, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform

necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors. Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, BOP may increase its use of home confinement.  Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). The Director of BOP may exercise discretion to do so, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of the drafting of this response, BOP has transferred 4,552 inmates to home confinement, which is an increase of 160% since March 2020. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, *at* https://www.bop.gov/coronavirus/.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

### C. Gettel's Medical Condition

BOP records indicate that Gettel is healthy and that his medical needs can be easily managed by medical visits every 6-12 months; he is at the lowest (or healthiest) "Care Level" at Level 1. *See* Inmate Profile (Exh. 3). Inmates at Care Level 1 are generally healthy and under the age of 70; they may have limited medical needs that can be easily managed by clinician evaluations every 6-12 months. *See* BOP Care Level Classification Guide (Exh. 4) (examples of the limited medical conditions that could exist within Care Level 1 as outlined by BOP include "mild asthma, diet-controlled diabetes…, well-controlled hyperlipidemia or hypertension, etc").

Gettel claims in his motion that he has "heart disease, history of cancer, and other medical and mental health conditions." Doc. 193 at 7. His medical records from BOP indicate that he reported major depressive disorder, hypertensive heart disease without heart failure, varicose veins, and unspecified hemorrhoids. *Id.* at Appx. A, Exh. 1, p.6. He is prescribed hydrochlorothiazide (a diuretic used to treat high blood pressure) and Lisinopril (an ACE inhibitor used to treat blood pressure). *Id.*

The CDC identifies individuals at increased risk for severe illness from COVID-19 as those with "serious heart conditions," which include heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension. *See* cdc.gov/coronavirus. The CDC considers that people with hypertension or high blood pressure "might be at an increased risk for severe illness from COVID-19," along with other conditions like asthma, cystic fibrosis, liver disease, pregnancy, and smoking. *Id*.

Gettel is housed at FCI La Tuna. Exh. 3. According to the latest information from BOP sources, at the time of drafting of this response, FCI La Tuna has no confirmed active cases of COVID-19 among its inmate population, and five active cases among its staff.

### D.  Gettel's Family Circumstances

At the peak of Gettel's real estate fraud schemes, he was married to Kathryn Nighswander. They lived together with their child on Calle Del Oro. Unbeknownst to Nighswander at the time, Gettel fraudulently encumbered their home with massive amounts of debt by deceiving lenders into believing the home was debt-free. As he did with investors, Gettel also led Nighswander to believe they had purchased the home outright. *See* FBI Report of Interview with Nighswander (Sept. 2018) (Exh. 4), at 3. Gettel arranged for Nighswander's signature to be forged so that he could leverage the home for additional loans. *Id*. He also had her open a number of business bank accounts, using her name, and set up trusts for their children. *Id*. at 7-8. In reality, Gettel used the many bank accounts held by Nighswander and their children to help conceal his involvement in a host of large real estate transactions, all of which were designed to further the fraud.

The marriage dissolved in 2013 around the time Gettel was engaged in the real estate fraud that eventually led to this case. Gettel and Nighswander divorced when their older child was five and the younger was just an infant. Gettel's fraud was unraveling, and the money was tight. Although the family had lived in multi-million dollar homes

in San Diego, and Nighswander believed those assets would be shared as part of the divorce, when she moved back to Tucson she was virtually penniless. *Id.* at 7, 8.

According to Nighswander's declaration submitted in support of Gettel's motion for release, she now cares for their two sons in Tucson, where she works at a nurse. Doc. 193, Appx. A, Exh. 2, p.9. Their older son suffers from cystic fibrosis, and requires significant medical attention and frequent medical appointments. *Id.* Nighswander's parents, who are in their 70s, have provided child care following the closure of the children's school in response to the COVID-19 pandemic. *Id.* Nighswander asserts that this arrangement is "not feasible" in the long-term and that without their assistance, she "will be effectively without safe child care options." *Id.*

## III

## ANALYSIS

### A. Legal Framework

The First Step Act of 2018 allows defendants, for the first time, to petition district courts directly for compassionate release. Under 18 U.S.C. § 3582(c)(1)(A), this Court may now modify an imposed term of imprisonment, but only under certain statutorily-enumerated circumstances. Relevant here, the Court may reduce a defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. §] 3553(a)" and only if the Court finds that (i) "extraordinary and compelling reasons warrant such a reduction" *and* (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). The defendant bears the burden to establish that he is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission's policy statement addressing the reduction of sentences is found in the U.S. Sentencing Guidelines ("USSG") §1B1.13.[3] That policy

---

[3] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the

requires a finding not only that: (1) "extraordinary and compelling reasons warrant the reduction;" but *also* (2) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" *and* (3) "the reduction is consistent with this policy statement." USSG §1B1.13. Relating to this third prong, the policy statement defines the types of medical conditions of the defendant and family circumstances that qualify as "extraordinary and compelling reasons" for a reduction.

As for the defendant's medical condition, that standard is met if the defendant is "suffering from a terminal illness" or if

> [t]he defendant is—
>
>> (I) suffering from a serious physical or medical condition,
>>
>> (II) suffering from a serious functional or cognitive impairment, or
>>
>> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG §1B1.13, cmt. n.1(A)(i), (ii).

As for the defendant's family circumstances, the policy statement defines two circumstances that qualify as "extraordinary and compelling reasons" for a reduction in sentence:

> (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

---

enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

       (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

USSG § 1B1.13, cmt. n.1(C).

Finally, it what may be referred to as the "catch-all" provision, the policy statement recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG §1B1.13, cmt. n.1(D).

## B. Gettel Has Not Identified "Extraordinary and Compelling Reasons" That Warrant a Sentence Reduction in This Case

Gettel has not satisfied his burden to demonstrate "extraordinary and compelling reasons" warranting his release from custody. As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction *and*, consistent with the Sentencing Commission's policy statements, the medical condition of the defendant or the defendant's family circumstances are such that he qualifies under the USSG's enumerated circumstances. USSG §1B1.13. Further, the "catch-all" provision does not allow unfettered discretion to re-evaluate those circumstances. For the reasons described below, Gettel cannot meet this burden and his motion should be denied.

### *1. Gettel's Medical Condition, Accounting For the Heightened Risk Presented by COVID-19, Does Not Qualify Him for Relief*

To state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that, as relevant here, he suffers from a "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG §1B1.13, cmt. n.1(A).

The COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held,

"the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A). To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

As noted, the BOP provides care for Gettel's hypertensive heart disease and necessarily considers his condition to be "easily managed" and "well-controlled." At Care Level 1, he is healthy and receives all necessary medical treatment and prescriptions to manage his health. His managed hypertensive heart disease does not place him within the CDC's category of "individuals at increased risk" of severe illness from COVID-19 (though it does suggest he "might" be at an increased risk). Under the current circumstances, Gettel's condition does not rise to the level of severity required under the USSG policy statement. Gettel has failed to establish that this is an "extraordinary and compelling reason" for a sentence reduction under § 3582(c).

### 2. *Gettel's Family Circumstances Do Not Qualify Him for Relief*

Similarly, Gettel's family circumstances do not present such "extraordinary and compelling" circumstances that a sentence reduction would be warranted in this case. Gettel's older son is well cared for by his mother, shares child care responsibilities with the children's grandparents, her own parents. While her parents may be unable to

sustain the level of care they have provided, this does not qualify for relief under the policy statement. To qualify as "extraordinary and compelling"—a high bar, to be sure—the Guidelines require that the caregiver has either died or been incapacitated. While Nighswander's work as a nurse presents additional challenges to providing child care, she has not been "incapacitated," and Gettel asserts only that without the extended assistance of her parents, she "will be effectively without safe child care options." He does not describe any effort taken to obtain other child care arrangements, either paid or through family or community support. This conclusory, and qualified, statement is the only effort Gettel has made to demonstrate that other child care options are unavailable. As the burden rests on Gettel to establish his "extraordinary and compelling" reasons for release, this effort is insufficient.

> **3. This Court Does Not Have Unfettered Discretion to Decide What Constitute "Extraordinary and Compelling Reasons" Outside of the Specific Factors Set Forth in the Commission's Policy Statement**

The First Step Act does not provide that courts may now decide when to reduce a prisoner's sentence based on subjective—and ultimately standardless—views of what constitute "extraordinary and compelling" reasons. Gettel's "catch-all" argument rests on faulty logic: he reasons that because the First Step Act removed BOP as the exclusive gatekeeper for compassionate release motions, it also invited courts to assume the same discretion BOP has to identify extraordinary and compelling reasons outside of a prisoner's medical conditions, age, and family circumstances. *See* USSG §1B1.13, cmt. 1(D). But no part of this inferential leap is justified by the text, context, or purpose of 18 U.S.C. § 3582(c)(1)(A).

The text of the statute is unambiguous. The Court "may not modify a term of imprisonment once it has been imposed" except in the limited circumstances in 18 U.S.C. § 3582(c). A reduction must be "consistent with applicable policy statements issued by the Sentencing Commission[.]" 18 U.S.C. § 3582(c)(1)(A). As detailed above, the applicable policy statement in USSG §1B1.13 provides a limited set of

14

circumstances that qualify as "extraordinary and compelling," including certain serious medical conditions; conditions relating to age combined with deterioration in health; and very specific, enumerated family circumstances. *Id.* The "catch-all" provision specifies that other reasons be "determined by the Director of the Bureau of Prisons[.]" USSG §1B1.13, cmt. n.1(D). The statute and policy statement plainly cabin the Court's ability to reduce a sentence and undermine Gettel's claim that the Court's powers in this regard could be unlimited. In rejecting such a claim, one district court observed that § 3582(c)(1)(A) communicates "express Congressional intent that the Sentencing Commission, not the judiciary, determine[s] what constitutes an appropriate use of the 'compassionate release' provision." *United States v. Willingham*, No. CR113-10, 2019 WL 6733028 at *2 (S.D. Ga. Dec. 10, 2019).

The context is equally clear. The directive that sentencing reductions must be the product of specific standards established by the Commission is not just expressed in 18 U.S.C. § 3582(c)(1)(A); it is reinforced through other statutes, as well. For example, in 28 U.S.C. § 994(a)(2)(C), Congress directed that the Commission adopt policy statements regarding "the appropriate use of . . . the sentence modification provisions" in § 3582(c). Congress instructed the Commission to specifically "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). Congress thus intended for courts to evaluate sentence reductions within the specific framework designed by the Sentencing Commission and not to use an unfettered discretion.

Critically, the purpose of the statute confirms these limits. Adhering to the policy statement furthers the important statutory purpose of finality in sentencing. "[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010). Section 3582(c) sets forth limited "exception[s] to the general rule of finality[.]" *Id.* To conclude that courts may determine what is "extraordinary and compelling," with no attendant standards, would

be to defeat this purpose because no sentence would be final or certain. Instead, federal courts would take over duties that parole boards once had. That cannot be. Parole was a relic of an "indeterminate-sentencing system" that engendered "[f]undamental and widespread dissatisfaction with the uncertainties and the disparities" it produced— leading to the abolition of parole and the adoption of a sentencing commission in the Sentencing Reform Act of 1984. *Mistretta v. United States*, 488 U.S. 361, 366-368 (1989).

The First Step Act "did not change the standards for compassionate release." *United States v. Willis*, 382 F.Supp.3d 1185, 1186 (D.N.M. 2019); *see* Pub. L. No. 115-391, § 603(b). Rather, its goal, as its title indicates, is "INCREASING THE USE AND TRANSPARENCY OF COMPASSIONATE RELEASE." *Id*. As one court concluded, "there is no comparable inherent incompatibility between a statute allowing defendants to move for compassionate release and a policy statement allowing BOP a role in determining whether compassionate release is warranted, and thus no basis for deeming the policy statement overridden." *United States v. Lynn*, No. 89-72-WS, 2019 WL 3805349 at *4 (S.D. Ala. August 13, 2019).

Defendant does not provide a cogent basis for why this Court may exercise the extraordinary power of reducing a final sentence without following the framework articulated by the Commission. Instead, he sidesteps, claiming that the statute "does not expressly define or limit what constitutes an 'extraordinary and compelling' reason for a sentence reduction." Doc. 193, at 5. Of course, as discussed at length above, the statute points to Sentencing Commission policy statements and *requires* that any reduction be consistent with those policies, including USSG §1B1.13.[4] Had Congress

---

[4] The cases Gettel cites in footnote 4 of his motion "rest upon a faulty premise that the First Step Act somehow rendered the Sentencing Commission's policy statement an inappropriate expression of policy." *Willingham*, 2019 WL 6733028 at *2. These cases wrongly concluded that there is no longer an applicable policy statement given the changes in the First Step Act. *See United States v. Redd*, __ F.Supp.3d __, 2020 WL 1248493 at *6 (E.D. Va. Ma. 16, 2020); *United States v. Maumau,* No. 2:8CR758, 2020 WL 806121 at *3 (D. Utah Feb. 18, 2020). The reasoning employed

16

wanted the courts to exercise the kind of discretion Gettel urges, Congress could have simply eliminated § 3582(c)(1)(A)'s requirement that a sentencing reduction be "consistent with applicable policy statements issued by the Sentencing Commission[.]" Yet that requirement remains.[5] It is clear that Congress did not intend for courts to exercise boundless discretion.[6] Ignoring that part of the statute would "offend[] the well-settled rule of statutory construction that all parts of a statute, if at all possible, are to be given effect." *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 633 (1973); *see also Lynn*, 2019 WL 3805349 at *4 ("If the policy statement needs tweaking

---

in these cases is unsound. Because "[i]t is a commonplace of statutory interpretation that Congress legislates against the backdrop of existing law[,]" *Parking Drilling Management Services, Ltd. V. Newton*, 139 S.Ct. 1881, 1890 (2019), Congress understood that by passing the First Step Act, an uncertain period of time must pass before the policy statement could be updated. Congress could not have intended to leave the courts' discretion untethered; such an interpretation would contravene the statute's express directive that the court follow the policy statement. It would also violate the Court's duty to choose an interpretation "which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested." *United States v. Sagg*, 125 F.3d 1294, 1295 (9th Cir. 1997). Here, the only interpretation consistent with that principle is that Congress wanted "the task of fleshing out the universe of extraordinary and compelling reasons to the Commission, not the judiciary." *Lynn,* 2019 WL 3805349 at *5.

[5] Although the current policy statement contemplates that only the BOP may bring a motion, this does not conflict with the First Step Act's new authorization for prisoner motions. It still makes sense for the "catch-all" provision to give the BOP discretion, based on its institutional experience, to determine other reasons that could be extraordinary. After all, the Act preserved the BOP's ability to bring a motion on a prisoner's behalf. 18 U.S.C. § 3582(c)(1)(A) (court may act "upon motion of the Director of the Bureau of Prisons"). Consequently, the policy statement's "descriptions of 'extraordinary and compelling reasons' remain current, even if references to the identity of the moving party are not." *United States v. Ebbers*, 432 F.Supp.3d 421, 427 (S.D.N.Y. 2020).

[6] To be sure, the BOP does not have unfettered discretion even to determine what falls within the "catch-all" provision. Rather, its analysis under Application Note 1(D) is guided by internal regulations defining circumstances under which it a prisoner's request is otherwise extraordinary and compelling. *See* BOP Program Statement 5050.50.

17

in light of [the First Step Act], that tweaking must be accomplished by the Commission, not by the courts."); *United States v. Shields*, No. 12CR410, 2019 WL 2359231 at *4 (N.D. Cal. June 4, 2019) (finding no "authority for the proposition that the Court may disregard the guidance provided by the Sentencing Commission where it appears that such guidance has not kept pace with statutory amendments").

### 4. *Even in Combination, Gettel Has Not Identified Extraordinary and Compelling Reasons Justifying Early Release*

Even if this Court concludes that it does have discretion to determine whether Gettel's circumstances fall within the "catch-all" provision, he has not met his burden. Gettel's personal health circumstances are unremarkable, and do not even meet the CDC's guidelines for high risk for COVID-19. His facility has managed the pandemic well with no reported active cases among its inmate population at the time of drafting this response. And Gettel is healthy with "limited medical needs that can be easily managed" by BOP medical staff. His son has an able caretaker with family support; he has not established that his mother is otherwise incapable of providing for his care.

Gettel's own medical circumstances do not exacerbate or even relate to his son's care; the two reasons Gettel offers are simply distinct. Even in combination, they do not rise to any definition of "extraordinary and compelling."

## C. Defendant Still Poses a Significant Danger to the Safety of the Community and the § 3553(A) Factors Strongly Weigh Against His Early Release

In any case, Gettel's request for a sentence reduction should be denied because he has failed to demonstrate that he otherwise merits release under the § 3553(a) factors—a distinct aspect of the analysis that is required before early release can be granted under § 3582(c)(1)(A).

Gettel is only 39 months into his 135-month sentence. He has served approximately one-third of his full term of imprisonment, even accounting for good time credit. His sentence—which was reduced by a jointly-recommended downward variance—was negotiated in a favorable sentencing agreement, which Gettel agreed

was a fair result.[7]  Gettel's sentence accounted not only for his history and characteristics, but the nature and circumstances of his serious, damaging, and far-reaching fraud scheme, which resulted in tens of millions of dollars lost by a host of victims over the course of years—a scheme that Gettel orchestrated and uniquely profited from.  It also accounted for the need to promote respect for the law, and to provide adequate deterrence to Gettel and to others who might contemplate similar schemes.  Indeed, Gettel's sentence included an enhancement for obstruction of justice, for the very reason that his "respect for the law" was clearly lacking in his period of pre-trial release.  Yet he received the benefit of a reduction for acceptance of responsibility.

Without any discussion of his efforts at rehabilitation or reason to believe Gettel has reformed, he asserts that his release—6 years earlier than this Court imposed—would not "place the public in any danger." Doc. 193, at 12.  This assertion ignores his complex, long-running, brazen scheme.  But far more troubling, it ignores his impenitent attitude on pre-trial release.  Not only did Gettel apparently feel unbound by the Court's order not to commit further crimes, but he attempted the very same complex, multi-million dollar real estate fraud he had already pled guilty to committing, and then lied to the FBI while purporting to cooperate with the very agents who discovered his new crime.  Much like his ex-wife once described, Gettel is a "master manipulator." Exh. 4, at 6.  He has presented no reason for this Court to conclude that he has changed his ways in the relatively short time he has served in custody.  He continues to pose a danger to the community and his early release is a risk he has not shown this Court should take.  Even in light of the COVID-19 pandemic, the 3553(a) factors and the policy statement at §1B1.13 (requiring a determination that the defendant is not a danger

---

[7] Nevertheless, since his sentencing hearing, Gettel has consistently worked to undermine this agreement.  Although he waived his right to appeal, he filed an appeal nonetheless.  And although he waived his right to collateral attack, he asked this Court to vacate his sentence.  These efforts failed.

to the community before a reduction can be ordered) strongly counsel against a reduction in Gettel's term of imprisonment.

## IV
## CONCLUSION

For the reasons discussed herein, Gettel has not established that he is entitled to a reduction in his sentence and his motion should be denied.

DATED: July 6, 2020                    Respectfully Submitted,

                                       ROBERT S. BREWER, JR.
                                       United States Attorney

                                       */s/ Emily W. Allen*
                                       EMILY W. ALLEN
                                       Assistant U.S. Attorney